**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

DAVID POST,

         *Defendant*

14 Cr. 715 (AKH)

**DEFENDANT DAVID POST'S SENTENCING MEMORANDUM**

**ALSTON & BIRD LLP**
Craig Carpenito
Adam Baker
90 Park Avenue
New York, New York
(212) 210-9400

*Attorneys for Defendant*
*David Post*

**TABLE OF CONTENTS**                                                **PAGE**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

PROCEDURAL BACKGROUND ........................................................................ 3

SENTENCING UNDER 18 U.S.C. § 3553(a) ..................................................... 3

I.    David' Personal History and Characteristics ............................................ 5

      A.  David's Commitment to His Family ............................................... 6

      B.  David's Commitment to His Friends and Their Children ................. 8

      C.  David's Friend's Rave about His Thoughtfulness ......................... 9

      D.  David's Commitment to Serving His Community ........................... 9

      E.  David's Shame and Remorse for His Conduct ............................. 10

II.   The Underlying Scheme and David's Substantial Cooperation with the
      Government ..................................................................................... 11

      A.   The Insider Trading Scheme .................................................... 12

      B.   David's Cooperation with the Government ................................ 14

           1.    David's Cooperation was Immediate and Provided without any
                 Promises from the Government ........................................ 14

           2.    David Provided New and Material Information that Assisted in the
                 Government's Case .......................................................... 15

           3.    David Returned the Ill-Gotten Gains Immediately ............... 16

           4.    David's Cooperation Continued with His Testimony at
                 Zwerko's Fatico Hearing ................................................. 16

III.  The Nature of David's Relevant Criminal Conduct Justifies a Below-The-Range
      Sentence ......................................................................................... 17

IV.   A Below-the-Range Sentence is Sufficient to Provide Just Punishment for the
      Offense ........................................................................................... 19

A.  David's Criminal Conduct is Aberrational ................................................................. 20

B.  A Sentence of Probation is Punitive as a Matter of Law ............................................. 20

C.  A Sentence of Probation Will Provide Sufficient Deterrence and Protect the
    Public from Further Crimes ...................................................................................... 21

D.  David has Demonstrated Significant Rehabilitation, including Finding
    Gainful Employment ................................................................................................. 22

E.  David Does Not Need Any Correctional Treatment and Intends to Counsel
    Others on Avoiding His Pitfalls ................................................................................ 23

F.  The Need to Avoid Unwarranted Sentence Disparities ............................................. 23

CONCLUSION ................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                       <u>PAGE(s)</u>

*Bateman, Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985)......................................................................................................18, 19

*Kimbrough v. U.S.*,
   552 U.S. 85 (2007).............................................................................................................4

*Koon v. U.S.*,
   518 U.S. 81 (1996).............................................................................................................3

*Rita v. U.S.*,
   551 U.S. 338 (2007)...........................................................................................................4

*SEC v. Thome*,
   638 F. Supp. 596 (S.D.N.Y. 1986)..................................................................................19

*U.S. v. Booker*,
   543 U.S. 220 (2005)...........................................................................................................3

*U.S. v. Brady*,
   No. 02 CR 1043 (JG) 2004 WL 86414 (E.D.N.Y. Jan. 20, 2004)..........................................20

*U.S. v. Crosby*,
   397 F.3d 103 (2d Cir. 2005)................................................................................................4

*U.S. v. Devlin*,
   No. 08-cr-01307-WHP (Mar. 23, 2012) ..........................................................................25

*U.S. v. DeVore*,
   No. 11-cr-00032-JSR (Dec. 5, 2013) ...............................................................................25

*U.S. v. Far*,
   No. 09-cr-01009-RPP (Feb. 11, 2013)..............................................................................24

*U.S. v. Frias*,
   521 F.3d 229 (2d Cir. 2008)..............................................................................................23

*U.S. v. Fortuna*,
   No. 09-cr-1003-SHS (Feb. 13, 2013)................................................................................25

*U.S. v. Gall*,
   552 U.S. 38 (2007)...............................................................................................4, 20, 21

*U.S. v. Ghailani*,
   733 F. 3d 29 (2nd Cir. 2013)............................................................................................23

**CASES**                                                                      **PAGE(s)**

*U.S. v. Hoxie,*
      No. 10-cr-00879-AKH (Feb. 22, 2011) ...................................................26

*U.S. v. Jones,*
      460 F.3d 191 (2d Cir. 2006)...............................................................4

*U.S. v. Kumar,*
      No. 10-cr-00013-DC (Jul. 19, 2012)....................................................24

*U.S. v. Longoria,*
      No. 11-cr-00032-JSR (Jul. 1, 2013)....................................................24

*U.S. v. Motey,*
      No. 10-cr-01249-JSR (Feb. 4. 2013) ...................................................24

*U.S. v. Nguyen,*
      No. 11-cr-00032-JSR (Oct. 17, 2013)..................................................24

*U.S. v. Pflaum,*
      No. 10-cr-01265-JSR (Jan. 31, 2013) ..............................................24, 25

*U.S. v. Plate,*
      No. 10-cr-0056-RJS (Nov. 2, 2011)....................................................25

*U.S. v. Preacely,*
      628 F.3d 72 (2d Cir. 2010)................................................................4

*U.S. v. Scolaro,*
      No. 11-cr-00429-WHP (Aug. 2, 2012) ...............................................24

*U.S. v. Shah,*
      No. 12-cr-00404-JGK (Oct. 24, 2014)................................................24

*U.S. v. Shankar,*
      No. 09-cr-996-RJS (Apr. 18, 2012) ...................................................25

*U.S. v. Shimoon,*
      No. 11-cr-00032-JSR (Jul. 1, 2013)....................................................24

*U.S. v. Slaine,*
      No. 09-cr-01222-RJS (Jan. 20, 2012) .................................................25

*U.S. v. Smith,*
      No. 11-cr-00079-JSR (Jun. 26, 2012)..................................................24

**CASES**                                                                                    **PAGE(s)**

*U.S. v. Speed Joyeros, S.A.*,
    204 F. Supp. 2d 412 (E.D.N.Y. 2002) ................................................................12

*U.S. v. Tucker*,
    No. 08-cr-00893-AKH (Jul. 29, 2009).............................................................26

*U.S. v. Wang*,
    No. 12-cr-00541-JSR (Jan. 9, 2013) ...............................................................24

*U.S. v. Wong*,
    40 F.3d 1347 (2d Cir. 1994)............................................................................22

**STATUTES**

17 C.F.R. § 240.10b-5 (2015) .................................................................................3

17 C.F.R. § 240.10b5-2 (2015) ...............................................................................3

15 U.S.C. § 78ff (1982) ...........................................................................................3

15 U.S.C. § 78j(b) (1982) .........................................................................................3

15 U.S.C. § 78u(d)(2) (1982) .................................................................................18

18 U.S.C. § 2 (2006) ...............................................................................................3

18 U.S.C. § 371 (2006) ............................................................................................3

18 U.S.C. § 3553(a) (2006)........................................................................3, 4, 23, 27

18 U.S.C. § 3553(a)(1) (2006) ................................................................................4

18 U.S.C. § 3553(a)(6) (2006) ...............................................................................23

## <u>PRELIMINARY STATEMENT</u>

David Post accepts full responsibility for his conduct and now comes before this Court to accept the consequences of his actions.  He understands that the path that brought him before Your Honor was forged of his own free will and poor decisions, and he is truly sorry for what he did.  He has disappointed his family, friends and society, and for that, he blames only himself.

David also comes before this Court having done everything within his power at this time to makes amends for his conduct and, as Your Honor will hear directly from David at sentencing, he intends to continue to do so by making a concerted effort to talk with teenagers and young professionals about his missteps and to encourage them to avoid making mistakes similar to those that lead him to this courtroom.

But perhaps the truest measure of a person is how they react and comport themselves in the face of adversity.  On October 8, 2014, agents from the Federal Bureau of Investigation ("FBI") made an unannounced visit to David's home in Livingston, New Jersey and questioned him about his insider trading with co-Defendant Zachary Zwerko.  Although David initially panicked and failed to take responsibility for his actions, he immediately realized the error of his ways and that same evening retained counsel and initiated the path that led to his substantial cooperation with the Department of Justice ("DOJ"), FBI and Securities and Exchange Commission ("SEC") (collectively, the "Government") in this matter.  The very next day, with no assurances or cooperation agreement in place, he met with Assistant United States Attorneys Jessica Masella and Edward Kim, agents from the FBI and representatives from the SEC for hours and confessed the truth, including numerous self-incriminating details unknown to the Government at the time.  During this initial meeting and various others meetings with the Government, David provided timely, complete and unfettered cooperation, which substantially

assisted the Government in the successful prosecution of Defendant Zwerko.

David's actions stand in stark contrast to his co-conspirator, Defendant Zwerko, who, when confronted with the identical choice, followed a path devoid of cooperation − the one he strongly advised David to follow as well.  Indeed, as this court is well aware, even after entering into a plea agreement, Defendant Zwerko retracted his prior agreement and unexpectedly disputed certain facts at his sentencing hearing, forcing the Court to hold a *Fatico* hearing. Testifying against his former friend in open court, David continued his cooperation, preparing with the Government and providing critical testimony that set forth the details of the insider trading scheme and the plans for him and Zwerko to split their profits.

In sum, as we anticipate the Government will detail in its 5K1.1 motion, David provided timely and critical cooperation to the Government.  He conducted himself as a model cooperator, providing truthful and complete information that was damning to both himself and Defendant Zwerko.  As Your Honor will read in the numerous letters submitted on his behalf, David is a loving family man, a loyal and unselfish friend and an active member of his community.  David has never run afoul of the law before and deeply regrets and is ashamed of his actions, which have already taken a severe toll on him and his family.  In addition to being a convicted felon for the rest of his life, he has lost his job and will likely lose any prospect of working in the securities industry or any other occupation requiring a professional license ever again.  Despite the challenges of seeking employment as a convicted felon with the uncertainty of sentencing looming, David has worked hard to rehabilitate himself and better his situation by obtaining gainful employment to support his family financially.

For these and the additional reasons set forth below, we respectfully request that Your Honor sentence David to a non-custodial sentence of probation.

- 2 -

## PROCEDURAL BACKGROUND

On October 24, 2014, David was charged in a four-count criminal information (the "Information") filed in the United States District Court for the Southern District of New York. The Information charged David with committing securities fraud in violation of Title 15, United States Code, §§ 78j(b) and 78ff, and Title 17, Code of Federal Regulations, §§ 240.10b-5 and 240.10b5-2; and conspiring to commit securities fraud in violation of Title 18, United States Code, Sections 2 and 371. In addition, David signed a cooperation plea agreement with the Government (the "Cooperation Agreement"), where he admitted the allegations in the Information and agreed to pay restitution and forfeiture in an amount to be specified by the Court.

On the same day, David appeared before Your Honor and pleaded guilty to the foregoing charges. A final Presentence Investigation Report, dated September 8, 2015, was prepared by United States Probation Officer Zondra Jackson with a total offense level assigned of 19. David's sentencing is currently scheduled for November 12, 2015.

## SENTENCING UNDER 18 U.S.C. § 3553(a)

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crimes and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The factors outlined in 18 U.S.C. § 3553(a) have taken on renewed vitality in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005), requiring "sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.' 18 U.S.C. § 3553(a)(1)." *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010)

(J. Lynch concurring).   Sentencing courts "may not presume that the Guidelines range is reasonable" or that "'extraordinary circumstances" are required "to justify a sentence outside the Guidelines range." *United States v. Gall*, 552 U.S. 38, 47, 50 (2007); *see also Rita v. United States*, 551 U.S. 338, 351 (2007).

The "overarching" charge of Section 3553(a) is the "Parsimony Clause," which "instruct[s] district courts to 'impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (emphasis added).

Judges have freedom to exercise discretion in fitting sentences to a defendant's individual circumstances, *see United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), and to give "consideration [to] the judge's own sense of what is fair and a just sentence under all the circumstances." *See United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

The §3553(a) factors are well-known to the Court:

> (a)      Factors to be considered in imposing a sentence. –The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider –
>
> (1)      the nature and circumstances of the offense and history and characteristics of the defendant;
>
> (2)      the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from the further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the [Sentencing Guidelines]

***

(5)     any pertinent policy statement –

***

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense."

As explained in greater detail below, there are multiple grounds on which this Court may, and respectfully, should give David a non-custodial sentence of probation, which would be "sufficient, but not greater that necessary" in this case.

## I.    David' Personal History and Characteristics

David was born December 25, 1972 in New Rochelle, New York to his parents, Michael and Vivian Launer Post.  Michael, age 73, is a retired executive who worked in computer consulting and Vivian passed away in 2009 from cancer.  David's wife of nearly 11 years, Debra ("Debbie"), operates a stationary and greeting card store.  David has two children – a daughter, Sydney, who is 9 years old and a son, Dean, who is 7 years old.  David grew up with his brother, Jeffrey Post, who is married and has two children.

Perhaps the most difficult task society asks a sentencing judge to perform is to measure the individual, especially when its primary insight into the defendant is anomalous conduct, as is the case with David.  Therefore, we know how much the Court values the view it can obtain through the eyes of those who have known David throughout his life – his family, friends, colleagues and members of his community.  Here, the letters submitted on David's behalf paint a clear portrait of a man deeply committed to his family.  David's devotion to others, however, is

not confined just to his family.  As detailed below and in the letters, David has always given a

person's most valuable resource – his time – to friends, children and others in his community.

### A.  David's Commitment to His Family

The strongest sentiment in each and every letter submitted on David's behalf is that he is

a dedicated family man who is an incredible father to his children, devoted husband to his wife,

Debbie, and the caretaker for his extended family (as well as many friends).  In fact, Jill Post,

David's sister-in-law, stated that David "understands that family is the most important thing,

especially since the loss of his mother 7 years ago very suddenly to Leukemia.  David was the

first one to step up during her illness to call her doctors to get the best information, and relaying

it to the rest of the family so that we could make the best decisions about her care."  (Ex. E, Jill

Post Letter.)  Cynthia O'Brien, a family friend, stated:  "David was by his mother's side every

day before she passed and he has been there for his father every day since.  He is someone that is

always there for others and that a lot of people depend on.  He is someone that I am proud to call

a friend."  (Ex. L, O'Brien Letter.)   Laura Buttigieg, another family friend, added about the

passing of David's mother:  "I will always remember that, despite being exhausted from

countless hours in the hospital and consumed by grief, Dave was always more concerned with his

father's well-being than his own.  This is truly David's nature."  (Ex. H, Buttigieg Letter.)

In addition, David has made great efforts to assist and care for his two autistic nephews.

Loretta Wood, David's aunt, explained that David's "brother has 14-year old twin sons who are

both special needs children.  David has been particularly supportive and helpful filling in for

them at their home, including the twins in children's activities in his own home and as a

sounding board for his brother as he found his way through the difficulties inherent in this

situation."  (Ex. F, Wood Letter.)  David's brother, Jeffrey Post, added:  "[David's] nephews,

both on the autism spectrum, can be challenging to some, exasperating to others.  Yet Uncle David is always there, engaging them in conversation, making jokes, or playing ball."  (Ex. D, Jeffery Post Letter.)

It is also striking how moved David's friends and family are with his dedication to being a husband and father.  David's mother-in-law, Cindy Newman, stated that "[i]n 2004 when I found out that Dave was going to marry my daughter I couldn't have been happier.  Dave is one of the kindest, most considerate and most thoughtful person I ever met."  (Ex. C, Newman Letter.)  David's aunt, Loretta Wood, added:  "David is not one of those husbands that floats through the house leaving everything to his wife.  He is a full-on co-partner with Debbie doing such things as laundry, food shopping, picking up and dropping off the children at various activities and friends' houses."  (Ex. F, Wood Letter.)  Regarding his parenting, Susan Heyman stated:  "I have always known Dave to be an incredibly nurturing father to his seven-year old son Dean and nine-year old daughter Syndey.  When Dean was a toddler he had anxiety falling asleep and sometimes made himself so upset that he would throw up.  Rather than becoming frustrated with this situation and taking it out on Dean, Dave would spend hours trying to console Dean and help him to overcome his fears."  (Ex. I, Heyman Letter.)

Indeed, although it is by no means a justification for his actions, the motivation for David's participation in the very conduct that brings him before this Court was family.  As Your Honor heard during Defendant Zwerko's *Fatico* hearing, David foolishly viewed this as a way to better support his family financially.  David did not buy luxury items with the ill-gotten gains or take any lavish trips.  Instead, he planned to use the money to pay for his children's athletic and temple-related activities, including Hebrew school, and to send them to summer camp.  Although the use of the proceeds in no way justify the means by which he obtained them, it is worth noting

David's use of the money as a window into his mindset at the time.  David's father agrees that family was the root of David's motivation:  "This easy way of getting ahead is the opposite of how he previously approached life … I believe his desire to more adequately provide for [his family's] needs was a large part of his misguided motivation for his unacceptable actions."  (Ex. B, Michael Post Letter.)

**B.  David's Commitment to His Friends and Their Children**

David's kindness and generosity of spirit consistently extends beyond his own family to his friends and their children.  Indeed, a consistent theme within the letters submitted to the Court on David's behalf is that, despite David's error, these parents would have no problem continuing to trust David with what is most important to them in the world – their own children.  Susan Heyman, a family friend, stated:  "Dave always includes my kids in his activities and any other kids that happen to be around.  In fact, he often goes out of his way to make sure that a child never felt left out of a game or discussion.  To that end, I trust Dave unconditionally with my children.  When we lived in New Jersey, he would pick up, drop off, or watch my kids as though they were his own."  (Ex. I, Heyman Letter.)  Edward Steinberg, a family friend and attorney admitted to practice before this Court, stated that "[o]ver the years, David has cared for my son as if he was his own.  David has always taken the time to be a responsible role model as a father and husband."  (Ex. Q, Steinberg Letter.)  "Furthermore, my trust in David with my son Jack will not change either.  I will continue to have the utmost confidence that David will always look out for my family's well-being and safety…"  (*Id.*)  Finally, Scott and Nancy Ritch added that "Dave consistently instills in his children (and to my children and other numerous children that we have coached) the lessons of right and wrong and the proper way to treat other people."  (Ex. M, Ritch Letter.)

### C.  David's Friend's Rave about His Thoughtfulness

Another consistent refrain throughout the letters is that David is a person who goes the extra mile for others, particularly when they are in need.  For example, Barry and Patti Roberts, friends and neighbors of David, wrote:  "The most outstanding example we can possibly offer of David's extreme thoughtfulness was during Hurricane Sandy.  We were out of town and lucky enough to miss this historic event.  Our community lost power for more than a week and David had to relocate his family.  He not only worried about his own home he came to check daily, but each day he'd call us with a report after going into our home to make sure everything was okay.  Once the power was restored, before we could ask a relative to go into our home and clean out the refrigerator and freezer, David had already done so.  Carefully sorting through things and preserving and cleaning plastic containers that contained food!  Not just throwing everything in the garbage."  (Ex. N, Roberts Letter.)

Eric Ross, another friend of the family, stated:  "If Robin and I have an emergency or have to go out last minute, he is the first person I'm calling…When I needed to go to the hospital (for a broken nose) late at night and my wife Robin couldn't leave the kids unattended – naturally it was David who drove me right over to the hospital and waited with me to make sure I was being taken care of."    (Ex O, Ross Letter.)   Finally, Barry and Patti Roberts added:  "David Post is always looking out for the other guy and always willing to lend a hand.  He puts other people before himself because that's just the way he thinks.  There aren't enough people like that in today's world where most people are so focused on themselves."  (Ex. N, Roberts Letter.)

### D.  David's Commitment to Serving His Community

David is also dedicated to serving his community, including mentoring children through his coaching of youth athletics and helping those in need.  David's Rabbi, Clifford M. Kulwin,

stated that "David has maintained a busy schedule of volunteer activities in our community.  He currently coaches the Junior Lancers 2nd grade football team.  He just finished coaching the West Orange street hockey team and before that was one of the coaches on the 'Under 8' travel basketball team.  Last winter he coached basketball at the West Essex YMCA and floor hockey at the Kushner Academy.  He also coached recreation league soccer last fall."  (Ex. G, Kulwin Letter.)  In addition, Rabbi Kulwin went on to note that David "has been a weekend volunteer on an as-needed basis at Daughters of Israel, the area nursing home for the Jewish community.  He assists residents as they go to and return from physical therapy, and also acts as a general helper to the therapists.  David hopes to continue his service at Daughters of Israel.  Further, he and I have discussed him speaking publically about his actions, in hope of deterring others from the mistake he made."  (*Id.*)  Finally, he noted that David has also applied to be a Big Brother for the Big Brothers/Big Sisters organization in Newark, but they are awaiting his sentencing before he receives his placement with a "little."

Notably, David wants to use this experience to help others and warn them of the consequences that follow from committing a crime.  He plans to do this by speaking with students at a local high school and would also like to do the same at Rutgers Business School, his alma mater.

### E.  David's Shame and Remorse for His Conduct

Importantly, many of the letters submitted on David's behalf express how deeply David regrets his conduct, has accepted responsibly and has been trying to turn his life around ever since.  Rabbi Kulwin stated that "David was straightforward.  Almost his opening words were, 'I got greedy.'  He made no excuse for what he has done.  He simply stated that an opportunity had presented itself, he became greedy, and he tried to take advantage of it.  He made it clear it was

entirely his fault." (Ex. G, Kulwin Letter.)  David's brother added:  "When David first told me that he had been charged with insider trading, I was stunned.  But when I heard David's voice in telling it, I could hear that in his own way, he was stunned, too.  It was the voice of a person who knew he had done wrong, the 'I can't believe I've done something so stupid' tone that I'd heard before over the years." (Ex. D, Jeffrey Post Letter.)

David's wife, Debbie, stated that "Dave has always been an honest, loving and truthful person.  He has never felt the need to hide anything from me … This incident was truly an isolated situation.  I always had the trust in Dave that he would make the right decisions for our family.  In this case he clearly did not.  However, as disappointed as I was/am with his terrible, thoughtless decision…, I am equally proud of how he has handled the aftermath." (Ex. A, Debra Post Letter.)  Finally, Scott and Nancy Ritch, family friends, added that "[t]o say that Dave has already been punished is an understatement.  He has suffered from his name being in the paper and having to prove himself again to all the people he has known in the past and has everyday interactions with.  He has also lost his source of income in a job that took him years to reach.  Not that anyone should feel sorry for him as he fully admits that what he did was wrong, it's just that if rehabilitation is the endgame, then I can, with utmost confidence, say that there is 0 chance of David ever doing this again (or anything even questionable after living through this)." (Ex. M, Ritch Letter.)

## II.     The Underlying Scheme and David's Substantial Cooperation with the Government

One of the most compelling reasons for the Court to consider a sentence of probation is David's substantial cooperation with the Government over the last year.  As discussed in greater detail below, David's prompt cooperation at the earliest stages lead to the speedy and successful prosecution of this matter, including of his co-conspirator, Defendant Zwerko.  Indeed, after

consulting with the Government, we anticipate that the 5K1.1 motion it files will speak volumes as to the value, timeliness and reliability of David's cooperation.  And importantly, as the Court is aware, when the Government makes a 5k1.1 motion, there is no limit to the court's ability to depart downward from the Guideline range.  *See United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 428 (E.D.N.Y. 2002).

**A.  The Insider Trading Scheme**

As this court heard during the *Fatico* hearing on October 13, 2015, David and Defendant Zwerko attended Rutgers Business School together, were friends and both graduated in 2010. After graduation, Zwerko worked at a pharmaceutical company in New Jersey.  In late 2010, David and Zwerko were in a bar together and Zwerko approached David about an idea he had to make money.  Zwerko explained that he had access to material, non-public information concerning potential and actual corporate transactions by virtue of his position at the pharmaceutical company.  Specifically, the information related to companies that Zwerko's employer was looking at as potential takeover targets.  Zwerko explained that since these companies had a high likelihood of being acquired and an acquisition announcement would typically materially increase their stock price, purchasing stock in these companies before the announcement based on this non-public information could be very profitable.  Zwerko further explained that he could not place the trades himself because the information was non-public and he was restricted from trading these stocks by his employer.  However, Zwerko indicated that if he provided the information to David, David could then place the trades in his accounts and it would go undetected by Zwerko's employer.  Zwerko and David would then split the profits. David expressed openness to this idea.

After some additional discussion, Defendant Zwerko began providing David with non-

public information about companies his employer was vetting as potential takeover targets in 2012, including Ardea Biosciences, ViroPharma, Inc. and Idenix Pharmaceuticals. These messages were often sent in e-mail accounts that David and Defendant Zwerko created specifically to communicate about the scheme. At times, David and Defendant Zwerko would also access an e-mail account they both had login credentials for and would leave messages for each other in the draft folder without sending them. In addition, they often spoke in code and at times used disposable cellular phones. This was all done in an effort to avoid detection.

Based on the messages containing directive from Defendant Zwerko, David would purchase shares of stock in companies based on Defendant Zwerko's belief that a subsequent takeover announcement would increase the stock price and a profit would be made. Some of the stocks did not result in a profit, but others, including the three companies identified above, did. The vast majority of the profits were made on the last stock purchase in the company Idenix Pharmaceuticals in or around May and June of 2014. In total, the gross profits for Ardea Biosciences, ViroPharma, Inc. and Idenix Pharmaceuticals ultimately reached approximately $737,000 (of which, Idenix alone represented approximately $579,000).

Once the stock prices increased, David would subsequently sell the shares. David ultimately provided Defendant Zwerko $57,000 toward his share of the profits. However, since taxes had not been paid on most of the profits and it was difficult for David to withdraw large sums of cash from his accounts without raising red flags, Defendant Zwerko had not yet received his full share of the profits by the time the scheme was detected. However, as David has testified, Defendant Zwerko understood the amount of profits made and was expecting additional payments from David at the time of his arrest. In addition, David and Defendant Zwerko agreed to leave some of the funds in the account to ensure they were ready if Defendant Zwerko

received additional non-pubic information on which they could trade.

As the Court is aware, while Defendant Zwerko and his attorney argued vigorously at the *Fatico* hearing that Defendant Zwerko's share was only the $57,000 that he received, the Court credited David's testimony and found against Defendant Zwerko on this point at his sentencing.

## B. David's Cooperation with the Government

On the morning of October 8, 2014, agents from the FBI made an unannounced visit to David's home in Livingston, New Jersey and questioned him regarding evidence of his insider trading in the various stocks discussed above. David was in the shower when the agents arrived, but his wife answered the door and invited the agents in, completely unaware of why they were there. During this initial meeting, David panicked wondering if the agents might arrest him on the spot in front of his family if he confessed. Instead, he made the unfortunate decision not to take responsibility for his actions. Once the agents left, David immediately realized the error of his ways and knew he had to fix it.

### 1. David's Cooperation was Immediate and Provided without any Promises from the Government

That very day, David retained counsel, who, at his behest, immediately reached out to the FBI agents to correct his misstatements. On October 9, 2014, the very next day, David was at the United States Attorney's Office meeting with the Government to confess the truth of his involvement in, and all the details relating to, the insider training scheme. Notably, at this initial meeting, David provided a full and complete confession – including details previously unknown to the Government – without the benefit of a cooperation agreement or any promise of reduced exposure. He did know, however, that he was prepared to plead guilty and accept responsibility for his actions. In addition, he also understood that if the Government ultimately decided to enter

- 14 -

into a cooperation plea agreement with him, there could be no promises that the Government could make regarding his sentence.   Nevertheless, David accepted responsibility and proceeded on the belief that he was doing the right thing.   David's decision to cooperate immediately without alerting Defendant Zwerko enabled the Government to take swift action.

### 2. David Provided New and Material Information that Assisted in the Government's Case

Throughout his meetings with the Government, David provided complete and unfettered cooperation, including the provision of new and detailed information regarding the insider training scheme, which assisted the Government in the successful prosecution of the matter.  This included providing the Government with a timeline of the scheme, starting with when Defendant Zwerko approached David and pitched the idea to trade on non-public information from Zwerko's employer.   In addition, David provided information regarding how the scheme was organized, how he suspected Defendant Zwerko obtained the non-public information from his former employer, the accounts that were used to place the trades, the stocks that were traded, the profits and losses from the trades, the funds that were used and the cash payments provided by David to Defendant Zwerko.   Importantly, David also provided evidence of communications between him and Zwerko, including text messages, e-mails (including an e-mail account created specifically for the purpose of allowing David and Defendant Zwerko to communicate about the scheme) and their use of disposable cellular phones.   In fact, David provided his disposable phone to the Government and tried to set up a call with Defendant Zwerko that would be monitored by the Government.   In addition, David helped the Government to decipher certain coded messages concerning the scheme between him and Defendant Zwerko.  This provided the Government with direct evidence to rely on in prosecuting this matter, instead of a largely

circumstantial case based on the timing of the trades.  Finally, David also provided details of how Defendant Zwerko intended to cover up the scheme if he was ever questioned by the Government and the advice Defendant Zwerko provided to David, encouraging him to do the same.

### 3.   David Returned the Ill-Gotten Gains Immediately

In addition, after David pleaded guilty, he returned the vast majority of ill-gotten profits that were still in his possession to the Government as soon as he could.  On December 30, 2014, David presented a cashier's check in the amount of $598,948.12 to the Government.  The check was deposited by the U.S. Marshals Service in the Seized Asset Fund pending further order from the Court.  Notably, David returned this money even before any judgment was entered against him by this Court.

### 4.   David's Cooperation Continued with His Testimony at Zwerko's *Fatico* Hearing

David's cooperation has continued, most recently demonstrated by his testimony at the *Fatico* hearing held in relation to Defendant Zwerko's sentencing.  As the Court is fully aware, during his sentencing hearing, Defendant Zwerko recanted his prior statements and unexpectedly disputed certain facts in his plea agreement, forcing the Court to hold a *Fatico* hearing to establish certain facts.  David was called as a witness by the Government and spent a number of hours preparing with for the hearing.  In taking the stand, David provided critical testimony on the record that set forth the details of the insider trading, including the anticipated split of the profits.  In addition, he walked the Court through account statements, profit and loss calculations, trade blotters and importantly, helped explain and clarify numerous details of the scheme.

One of the facts that Defendant Zwerko strongly disputed during the hearing was that his share of the proceeds was only supposed to be the $57,000 he actually received, and that the rest

of the profits were David's alone.  He further stated that he was unaware of the overall magnitude of the profits.  David's testimony provided strong evidence to refute Defendant Zwerko and explained that it was always understood that the friends would split the profits.  In addition, David was vital in explaining the various communications and deciphering much of the coded language he and Defendant Zwerko used when they were purchasing stocks as part of the scheme.  For example, David explained that when Defendant Zwerko said to buy more "tickets to the upcoming baseball game," he was actually instructing David to buy more shares of a certain stock, presumably based upon additional information Defendant Zwerko had garnered from his employer.  In addition, David explained and helped to demonstrate that it was clear to Defendant Zwerko how much the profits made with respect to each stock bought during the scheme were. David also walked the Court, in detail, through the accounting of the insider trading scheme's profits and losses, carefully clarifying any ambiguities and explaining how the trades related to "tips" provided by Defendant Zwerko.

As we anticipate the Government will describe in its 5K1.1 motion, David did everything he was asked to do throughout his tenure as a cooperator, including testifying in open court against his former friend and being subjected to cross-examination by defense counsel.  The information David has provided has been crucial in prosecuting this matter, and his conduct stands in stark contrast to Defendant Zwerko's.

## III.  The Nature of David's Relevant Criminal Conduct Justifies a Below-The-Range Sentence

As described above and detailed in the letters submitted on David's behalf, David has fully admitted and taken responsibility for his part in the afore-mentioned insider trading scheme. However, in assessing the nature of David's criminal conduct for sentencing purposes, without

attempting to make excuses for what David did, we respectfully submit that it is important to note that David was the tippee in the scheme, and did not breach a duty to his employer or anyone else in the same fashion that Defendant Zwerko did in misappropriating the non-public information.  In this regard, the Supreme Court has made clear that a tippee should generally be viewed as less culpable in an insider trading matter in comparison to the tipper.  *See Bateman, Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985) ("In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place").[1]  In explaining its position, the Supreme Court rightly characterized the insider as the "fountainhead" of an insider trading scheme, and observed that:

> [I]nsiders and broker-dealers who selectively disclose material nonpublic information commit a potentially broader range of violations than do tippees who trade on the basis of that information. A tippee trading on inside information will in many circumstances be guilty of fraud against individual shareholders, a violation for which the tipper shares responsibility. But the insider, in disclosing such information, also frequently breaches fiduciary duties toward the issuer itself. . . . ***Absent other culpable actions by a tippee that can fairly be said to outweigh these violations by insiders and broker-dealers, we do not believe that the tippee properly can be characterized as being of substantially equal culpability as his tippers.***

*Id*. at 313-14 (citations and footnotes omitted).  The Supreme Court added that "deterrence of insider trading most frequently will be maximized by bringing enforcement pressures to bear on the sources of such information – corporate insiders and broker-dealers." *Id.* at 316;

---

[1] The Supreme Court referenced the legislative history of the Insider Trading Sanctions Act of 1984, § 2, 15 U.S.C. § 78u(d)(2) (1982), as support for its position on the relative culpability of tippers and tippees. The legislative history provides that "[a]bsent the tipper's misconduct, the tippee's trading would not occur" and a tipper is therefore "most directly culpable in a violation." *Bateman*, 472 U.S. at n. 23 (citing H.R.Rep. No. 98-355, at 9, U.S. Code Cong. & Admin. News 1984, p. 2282).

*see also SEC v. Thome*, 638 F. Supp. 596, 617 (S.D.N.Y. 1986) ("the tipper's conduct, almost invariably, is more culpable than that of the tippee").

More recently, Judge McMahon of the Southern District of New York expressly recognized this distinction in sentencing an insider-tipper, commenting to her that "you are more culpable [than your husband-tippee]: you are the thief." Xujia Wang, et al., 07 Cr. 00730 (DC), Sentencing Tr., Dec. 4, 2007 (S.D.N.Y.), p. 29. In addition, the heightened culpability of tippers, particularly insiders, is reflected in the Guidelines' two level enhancement for abuse of trust, which is typically used to increase a tipper's offense level before any unlawful gain is factored into the equation.

Accordingly, although David accepts responsibility for his role in the scheme, based on the fact that David is the tippee and did not breach a duty to his employer or anyone else to obtain the inside information in the way Defendant Zwerko did, we respectfully propose that the nature of David's conduct here supports a below-the-range sentence of probation.

## IV. A Below-the-Range Sentence is Sufficient to Provide Just Punishment for the Offense

No matter what the Court ultimately deems appropriate as David's sentence with respect to confinement or financial penalty, David's punishment is already underway, is severe and will continue throughout his life. A man who previously never ran afoul of the law is now a convicted felon, and will likely be barred from working in the securities industry, where he had been previously successfully employed for more than a decade. He has also brought shame upon himself that, in the internet age, is easily and permanently accessible to anyone.

Of course, this is David's own doing and he blames no one but himself. It is befitting of the crime, but not of the man who committed it. The behavior and conduct to which he pleaded

guilty are inconsistent with the manner in which he otherwise conducted his life.  We respectfully submit that the community is better served through the circulation of David's message to others that even a momentary lapse in judgment can lead to lifelong consequences.

**A.  David's Criminal Conduct is Aberrational**

Prior to the conduct that now brings him before the Court, the closest brush David had with the law was a traffic ticket.  Nothing in his personal or professional background would suggest that David will engage in any further wrongdoing.  As his wife, Debbie, stated, "Dave made the very unwise decision to take what he thought was a short cut to a better life for his family and has been paying for it ever since. He is plagued by the guilt that he let his family down … What Dave did was unquestionably wrong, but he acknowledges his mistake, regrets it deeply, and is trying everything he can to make things right."  (Ex. A, Debra Post Letter.)

The letters submitted from his family, friends and colleagues afford insights into David's good moral character.  We ask that the Court consider the letters conscientiously, as we know it will, and factor them into its consideration in determining the appropriate sentence.

**B.   A Sentence of Probation is Punitive as a Matter of Law**

Sentencing a defendant to probation is not "an act of leniency."  *See Gall v. United States*, 552 U.S. 38, 44 (2007).  "[P]robation is … a punitive measure, and 'may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by defendant."  *United States v. Brady*, No. 02 CR 1043 (JG) 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (quoting *U.S. Guidelines Manual*, ch. 5, pt. B, introductory cmt.).

If sentenced to probation, David will be "subject to several standard conditions that substantially restrict [his] liberty." *Gall*, 552 U.S. at 48.  These restrictions may include being required to report regulatory to his probation officer, permit unannounced visits to his home, and refrain from associating with any person convicted of a felony, as well as restrict his ability to travel.  In addition, David will be a convicted felon, and lose many of his rights.

### C.  A Sentence of Probation Will Provide Sufficient Deterrence and Protect the Public from Further Crimes

With respect to specific deterrence for David, recidivism is not an issue for him, as he is an individual who has no prior arrests or other problems with the law.  David's extensive cooperation, lack of prior record and rehabilitation efforts show that he understands the gravity of his actions and is not a threat to repeat his crime or any engage in any other criminal activity.

In addition, with respect to general deterrence, it unlikely that anyone would want to trade positions with David at this moment.  He is a convicted felon who will have to explain his crime to his children, and has lost friends, his career, reputation, income, as well as the vast majority of his life savings.  In addition, David has also had to face issues with the media and the press coverage that his conduct garnered, which will follow him and his family for years to come.  These consequences are significant and life-altering, and his story is a cautionary tale regarding breaking the law.  His friends, Scott and Nancy Ritch, put it well in their letter to the Court when they stated that "[t]o say that Dave has already been punished is an understatement.  He has suffered from his name being in the paper and having to prove himself again to all the people he has known in the past and has everyday interactions with.  He has also lost his source of income in a job that took him years to reach.  Not that anyone should feel sorry for him as he fully admits that what he did was wrong, it's just that if rehabilitation is the endgame, then I can, with utmost

confidence, say that there is 0 chance of David ever doing this again (or anything even questionable after living through this)."  (Ex. M, Ritch Letter.)

### D. David has Demonstrated Significant Rehabilitation, including Finding Gainful Employment

Another factor that weighs in favor of this Court imposing a non-custodial sentence of probation is the substantial rehabilitation efforts by David over the past year.  *See United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994) (holding that a court may depart from the guidelines range in light of a defendant's potential for rehabilitation).  Since pleading guilty to charges stemming from the insider trading scheme, as discussed in detail above, David has unequivocally taken full responsibility for his actions, has provided immediate and substantial cooperation to the Government and has moved ahead in picking up the pieces of his life.  Indeed, David has continue to be there for his friends and family and has doubled-down on his service to his community.

In addition, with his family always at the forefront of his concerns, David has made monumental efforts to find gainful employment after being dismissed from his prior employer, even during this tumultuous and difficult time in his life.  His efforts have paid off and since January 2015, David has been working as a funding manager for Merchants Capital Services, where is a commission-based employee.  While David now earns a fraction of what he used to, the job has allowed him to provide at least some financial support to his family, which they desperately need at this time.  These efforts – and David's renewed ability to support his family – strongly support a sentence of probation so that David can continue to work and earn money to keep his family in their home and pay their bills.

Given the difficulty of finding gainful employment as a convicted felon, we strongly

encourage the Court to consider the value to both David and society in allowing David to continue his employment uninterrupted rather than issuing a custodial sentence that would place David's new job in jeopardy.

### E. David Does Not Need Any Correctional Treatment and Intends to Counsel Others on Avoiding His Pitfalls

With this Court's leniency, David intends to use this terrible experience to raise awareness about the consequence that can befall a lapse of judgment. As is clear from the letters submitted to Your Honor, David has built strong social and professional relationships. Now, he wants to utilize those resources to alert others to the consequences that follow committing a crime. In fact, Rabbi Kulwin stated in his letter to the Court that he has "discussed [with David] speaking publically about his actions, in hope of deterring others from the mistake he made." (Ex. G, Kulwin Letter.) David would like the opportunity to help others avoid the mistakes he has made and the consequences he now faces that stem from his actions.

### F. The Need to Avoid Unwarranted Sentence Disparities

A critical factor to be considered by this Court under Section 3553(a) is the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(6). Indeed, 18 U.S.C. § 3553(a)(6) expressly urges Courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See United States v. Ghailani*, 733 F. 3d 29, 55 (2d Cir. 2013); *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). As such, in this case, a non-custodial sentence of probation would be consistent with the sentences imposed on other similarly-situated defendants in insider trading cases. It would be appropriate for Your Honor to compare the sentences of these defendants in order to reach a similarly proportionate sentence for David – one which results

- 23 -

in probation.

A review of recent insider trading cases in this District and the sentences imposed reveals that cooperating defendants with conduct similar to David's, who were facing significant prison time under the Sentencing Guidelines, were nonetheless sentenced to probation based in large part based on their cooperation.  In fact, non-custodial sentences have been imposed on defendants that would appear to be more culpable than David, including some convicted after trial for trading, tipping inside information and other more egregious conduct. *See, e.g., U.S. v. Pflaum,* No. 10-cr-01265 (Jan. 31, 2013).   The table below identifies 16 such instances.

| Case | Judge | Guidelines | Sentence Imposed |
|---|---|---|---|
| *U.S. v. Shah*, 12-cr-00404 | Hon. John G. Koeltl | 24-30 mos. Prison | 24 mos. Probation |
| *U.S. v. Nguyen*, 11-cr-00032 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 24 mos. Probation |
| *U.S. v. Shimoon*, 11-cr-00032 | Hon. Jed S. Rakoff | 37-46 mos. Prison | 24 mos. Probation |
| *U.S. v. Longoria*, 11-cr-00032 | Hon. Jed S. Rakoff | 46-57 mos. Prison | 24 mos. Probation |
| *U.S. v. Far*, 09-cr-01009 | Hon. Robert P. Patterson | 46-57 mos. Prison | 24 mos. Probation |
| *U.S. v. Motey*, 10-cr-01249 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 12 mos. Probation |
| *U.S. v. Wang*, 12-cr-00541 | Hon. Jed S. Rakoff | 30-37 mos. Prison | 24 mos. Probation |
| *U.S. v. Scolaro*, 11-cr-00429 | Hon. William H. Pauley | 30-37 mos. Prison | 36 mos. Probation |
| *U.S. v. Kumar*, 10-cr-00013 | Hon. Denny Chin | 87-108 mos. Prison | 24 mos. Probation |
| *U.S. v. Smith*, 11-cr-00079 | Hon. Jed S. Rakoff | 57-71 mos. Prison | 24 mos. Probation |
| *U.S. v. Shankar*, 09-cr-996-RJS | Hon. Richard J. Sullivan | 30-37 mos. Prison | 36 mos. Probation |
| *U.S. v. Devlin*, 08-cr-01307 | Hon. William H. Pauley | 37-46 mos. Prison | 36 mos. Probation |

| | | | |
|---|---|---|---|
| *U.S. v. Slaine*, 09-cr-01222 | Hon. Richard J. Sullivan | 46-57 mos. Prison | 36 mos. Probation |
| *U.S. v. Plate*, 10-cr-0056 | Hon. Richard J. Sullivan | 30-37 mos. Prison | 36 mos. Probation |
| *U.S. v. Fortuna,* 09-cr-01003 | Hon. Sidney H. Stein | 37-46 mos. Prison | 24 mos. Probation |
| *U.S. v. DeVore*, 11-cr-00032 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 24 mos. Probation |
| *U.S. v. Pflaum,* 10-cr-01265 | Hon. John G. Koeltl | 46-57 mos. Prison | 24 mos. Probation |

These defendants, like David, offered substantial assistance to the Government and were accordingly recognized for their cooperation efforts. Indeed, in virtually every instance, the Judge presiding over each case recognized the defendant's cooperation as a significant factor in imposing a probationary sentence. For example, in *U.S. v. Fortuna*, No. 09-cr-1003 (Feb. 13, 2013), the defendant that traded on non-public information that he was provided and earned approximately $2.4 million in profits. However, the defendants cooperated with the Government in this action and other related investigations. As a result, the defendant was sentenced to two years of probation, which included six months of home confinement. Similarly, in *U.S. v. Shankar*, 09-cr-996-RJS (Apr. 18, 2012), the defendant pled guilty to trading using illicit tips on mergers and profited approximately $450,000. The offense level was 19, with a corresponding Guidelines range of 30 to 37 months. However, as a result of his cooperation with co-conspirators the defendant received three years of probation, including six months of home confinement.

In addition, we respectfully submit that Your Honor has sentenced several defendants with offense levels and criminal history categories that are similar to David's to non-custodial sentences. For example, Alan Tucker, who was also a tippee that was alleged to have personally profited approximately $1,054,979 from trading on inside information and

was facing 37 to 42 months in prison under the Sentencing Guidelines, but Your Honor sentenced him to three years' probation, including six months of home confinement and community service. *See U.S. v. Tucker*, No. 08-cr-00893-AKH (Jul. 29, 2009).  In addition, Bonnie Hoxie, who has an offense level of 9 and a Guidelines range of 4 to 10 months, was also sentenced to of probation and community service. *See U.S. v. Hoxie*, No. 10-cr-00879-AKH-1 (Feb. 22, 2011).

Accordingly, in light of the sentences afforded to similarly-situated cooperating defendants in other insider trading cases in this district, it is clear that non-custodial sentence for David is not only appropriate, but necessary, in order to avoid unwanted sentencing disparities. Indeed, it would be unwarranted for David to receive a harsher sentence.

## CONCLUSION

For the foregoing reasons, David respectfully submits that a below-the-range non-custodial sentence of probation is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Dated:   New York, New York            ALSTON & BIRD LLP
         October 29, 2015

                                       _____
                                       Craig Carpenito
                                       Adam Baker
                                       90 Park Avenue
                                       New York, New York 10016
                                       (212) 210-9400

                                       *Counsel for Defendant David Post*

- 26 -