*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 9, 2015

**BY ELECTRONIC MAIL AND HAND DELIVERY**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, 1050
New York, New York  10007

      Re:    **United States v. David Post**,
            **14 Cr. 715 (AKH)**

Dear Judge Hellerstein:

      The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that the defendant, David Post, has rendered in the investigation and prosecution of other persons.  In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Guidelines") and Section 3553(e) of Title 18, United States Code, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.  Post is scheduled to be sentenced before this Court on November 12, 2015.

**Background**

      During the years 2010 to 2014, David Post and another individual, Zachary Zwerko, participated in an insider trading scheme, during which they used material, non-public information ("MNPI") to trade in the securities of certain pharmaceutical companies.  On several occasions, Post obtained MNPI about potential acquisitions in the pharmaceutical industry from Zwerko, who then worked at Merck & Co. ("Merck") as an analyst.  Post then bought shares in the potential targets of the acquisitions and, in several cases, sold his positions for a substantial profit.

      This insider trading scheme was investigated by this Office as well as agents with the Federal Bureau of Investigation (the "FBI") and the United States Securities and Exchange Commission (the "SEC").  Post was initially approached by FBI agents on October 8, 2014, at

1

which time the FBI agents questioned Post about his role in this insider trading scheme. No charges were yet pending against Post. During that initial encounter, agents confronted Post about his trades in several of the relevant securities. Post denied having traded in any of these securities based on MNPI, and claimed instead that he had bought shares of those securities based on his own research.

However, later that same day, Post retained an attorney who, at Post's urging, promptly contacted the FBI agents and this Office. Post's attorney stated that Post wanted to convey that Post had made a terrible mistake by lying and was prepared to admit his wrongdoing and cooperate with the Government. The Government met with Post for the first time the following day, on October 9, 2014. During the course of several proffers, Post was candid about his own wrongdoing and also provided valuable information about Zwerko's involvement in the offense as well as the methods used in the crime (*e.g.*, disposable phones and shared email account) that they used to communicate about the plot. Post also agreed to reply to an email that Zwerko had sent him and worked with the FBI agents to draft a coded email that he then sent to Zwerko.

The Government charged Zwerko, in a criminal complaint, on the day following Post's first proffer session, October 10, 2014, and Zwerko was arrested the same day. Zwerko was later charged in an indictment with conspiracy to commit securities fraud and several substantive counts of securities fraud for his conduct in this scheme. Zwerko pleaded guilty to those crimes, but, in connection with his sentencing, Zwerko raised a number of issues with respect to facts material to sentencing. On October 13, 2015, this Court held a *Fatico* hearing, and heard testimony from Post with respect to those issues. On the same date, this Court sentenced Zwerko to a term of 37 months' imprisonment.

## Post's Background and Criminal Conduct

Post is 43 years old, married, and a father to two school-age children. He was raised in Spring Valley, New York, and currently resides in Livingston, New Jersey with his family. After graduating from the University of Michigan in 1994, Post worked at a couple of non-finance related jobs before starting work at Knight Capital Group in 1998 as a market maker. He left Knight in 2001 and began working at another financial firm, Luttenberg, but was fired in 2002. Post then worked at a series of short term jobs until he attended Rutgers Business School in 2008. Before graduating in 2010, he began working at the Bank of New York Mellon ("BNY") through a co-op internship, and upon graduating was offered a permanent position by BNY. Post most recently worked at BNY as a Vice President in Broker Dealer Services Product Management. He was suspended by BNY on October 8, 2014, based on suspicion of insider trading in connection with the scheme charged in the instant case.

In approximately August 2010, during a social encounter, Zwerko—whom Post had befriended while they were both classmates at Rutgers Business School—told Post that his job at Merck gave him access to confidential information related to potential pharmaceutical acquisitions.  Post understood that Zwerko was a mergers and acquisitions analyst at Merck, and, as such, that he worked on potential acquisitions and had access to information about acquisitions that was not publicly available.  Zwerko said that he would be able to pass such information to Post, who could then trade ahead of acquisitions.  The two men could then share in the resulting profits.  Post expressed his willingness to participate in the scheme.  During that initial conversation, Zwerko mentioned a specific security; Post did not purchase any shares of that particular security, but later saw that its share price had increased significantly.

Sometime between November 2011 and February 28, 2012, Zwerko contacted Post and told Post that he should buy shares of Ardea Biosciences, Inc. ("RDEA").  On February 28, 2012, Post began purchasing shares of RDEA, and ultimately bought approximately 9,800 shares.  On April 23, 2012, AstraZeneca publicly announced that it would acquire RDEA, and Post subsequently sold his RDEA shares for a profit of approximately $105,000.

Around this time, either Post or Zwerko set up a Gmail email account that the two agreed they would use in order to communicate about the scheme.  Post and Zwerko each had the password to the account and would leave messages for one another in the draft message folder.  For instance, Zwerko would draft a message in an email and, instead of sending it, would save it as a draft message.  Zwerko would then contact Post by phone or personal email and would tell Post in coded language (*e.g.*, check out an unrelated web link or article) to check the shared account.  Post would then log into the shared account, read the draft message left by Zwerko, and then delete the message.

Zwerko subsequently passed MNPI to Post about Alimera Sciences Inc. ("ALIM"), and Post started buying shares of ALIM in April 2012.  However, Zwerko subsequently told Post that he had lost visibility on what was happening with ALIM.  Post ended up selling off a portion of his shares of ALIM over time.  As of June 30, 2014, he still retained approximately 9,000 shares of ALIM for an unrealized gain of $29,905.

In or about October 2012, during Post's annual Halloween party, Post gave Zwerko $7,000 in cash.  Post and Zwerko had implicitly agreed to a 50/50 split of the gains from their scheme; however, on this occasion he gave Zwerko less than half of the profits gained by that point because he wanted to leave a buffer to account for taxes and potential losses.  Post also understood that Zwerko was willing to leave a portion of his proceeds with Post for the purpose of future investments in their insider trading scheme.  Post also added that while he told Zwerko approximately how many shares he purchased of the various securities Post told him to buy, he often rounded down, in order to retain more of the profits for himself.  For the same reason, Post also bought a small quantity of certain of the securities in a separate trading account which he intended to keep hidden from Zwerko.  That way, if Zwerko ever requested to review Post's brokerage statements, Post would only have provided the statements for the one account in which he carried out the majority of the trading activity.

Zwerko passed MNPI to Post about Viropharma Inc. ("VPHM"), and Post started buying shares of VPHM in September 2013. On November 11, 2013, a public announcement was made that Shire PLC, a pharmaceutical company, had agreed to acquire VPHM, and Post subsequently sold his positions for a profit of approximately $38,000.

Finally, Zwerko passed MNPI to Post about Idenix Pharmaceuticals, Inc. ("IDIX") on May 20, 2014 and told him to buy aggressively. In addition, during the interim time period, Zwerko and Post exchanged emails and text messages to communicate about the quantity and price of the IDIX shares purchased. During these communications, Zwerko was enthusiastic and encouraged Post to acquire more shares of IDIX. Post steadily bought shares of IDIX during this time period, and on June 9, 2014, a public announcement was made that Merck had agreed to acquire IDIX. Post sold his IDIX shares for a profit of approximately $579,000.

Around this time, Post suggested to Zwerko that they use disposable cell phones in order to communicate about the scheme. Over time, both men had made less use of the shared Gmail account and had begun communicating more by phone, and Post believed that using disposable phones would be more secure. Post subsequently bought two disposable phones, gave one to Zwerko, and kept one for himself. In July or August 2014, Zwerko stopped by Post's house, and Post gave him $50,000 in cash inside a shoebox, which was not a pre-arranged sum. Post's understanding was that Zwerko expected to be paid the rest of his proceeds at a later date, though the two did not make a specific arrangement as to when that would occur.

In approximately July 2014, Post was notified by his broker that BNY had obtained copies of his trading records. Post panicked and spoke with Zwerko, who reassured him and urged him to deny any criminal conduct if he was confronted. Zwerko also provided Post with a cover story about his IDIX purchases so that Post would be able to justify his purchasing decision by citing to publicly available reasearch.

With respect to most of the transactions, Post remembers that Zwerko indicated that each of the companies was the target of a potential acquisition. Post also understood that Zwerko was obtaining that information about the targets' potential acquisitions because of his position at Merck and because of Merck's potential interest in acquiring these companies. In addition, in most instances, after Post made his initial investment in a target company and before the consummated acquisitions were publicly announced, Post and Zwerko exchanged coded text messages and emails in which Zwerko would provide Post with updates as to the progress of an acquisition. For example, Post would communicate (in code) to Zwerko the number of shares that Post had acquired until that point, and Zwerko would communicate to Post whether he believed that the acquisition was still moving forward. With respect to IDIX in particular, based on the coded updates from Zwerko, Post believes that Zwerko had more specific information about the acquisition price and the timing than for the other transactions. In addition, in the coded messages, Zwerko was adamant that Post should buy as many shares as possible in IDIX.

Post has no prior criminal convictions and no other additional criminal conduct.

### Post's Plea

Post pleaded to a four-count Information, 14 Cr. 715 (AKH), on October 24, 2014, charging him with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371 (Count One); and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2 (Counts Two through Four); in connection with his trades in RDEA, VPHM, and IDIX. Post's guilty plea was pursuant to a cooperation agreement with the Government. Post also agreed to forfeit the proceeds of his criminal activity, nearly $600,000, and, in fact, has already made a payment of that amount to the Government towards the forfeiture.

### Post's Cooperation

Post's cooperation was crucial to the Government's ability to charge and prosecute Zachary Zwerko in connection with his role in this insider trading scheme, as well as to prove to this Court facts that were significant in sentencing Zwerko for that crime. Beginning on the very day that he was first approached by FBI agents in this case—and before he was charged with any crime—Post decided to cooperate with the Government. His cooperation was not only timely, but the testimony provided by Post was candid, forthcoming, accurate and reliable. It had a substantial impact on the Government's ability to successfully prosecute Zwerko for his role in this large-scale insider trading scheme.

As described above, although Post initially lied to FBI agents when they approached him at his home during the early morning hours of October 8, 2014, he quickly turned around. Immediately thereafter, he retained a lawyer and instructed his lawyer to reach out to the Government indicating that Post had lied, that he wanted to tell the truth, and that he wanted to help in any way that he could.

The very next day, Post attended a proffer session with this Office, the FBI, and the SEC. Post was candid, straightforward, and truthful throughout. He arrived with his own documents, including his statements from his trading accounts, and agreed to let the FBI agents search his cellphone, computer, and anything else that could provide relevant evidence to the case. Post also agreed to cooperate proactively, and offered to reach out to Zwerko by telephone or email, eventually sending an email to Zwerko at the direction of the FBI agents. It is no overstatement to say that, beginning on the same day that he was approached by FBI agents, Post did everything that he could do to cooperate with the Government.

Post's credibility during his first and subsequent proffer sessions was unblemished. During each and every meeting with the Government, Post was forthcoming and truthful. He did not minimize his own criminal conduct or that of others. Nor did he overstate the criminal conduct of others. Instead, Post's accounting of the relevant events was articulate, precise, and accurate. Indeed, it was Post's willingness to immediately cooperate as well as his obviously credible demeanor that contributed to the Government's decision to go forward and to charge and arrest Zwerko—which was based in part on Post's cooperation—on October 10, 2014, the day after Post's first proffer session. Although Post had not yet signed a cooperation

agreement with the Government, the Government was comfortable relying on his credibility and on his willingness to complete the cooperation process. From the first proffer, Post never wavered, which greatly contributed to the Government's ability to rely on him as a witness.

Post's cooperation was also extremely valuable to the Government in connection with Zwerko's sentencing. When it became apparent that Zwerko would challenge material facts about his offense conduct, such as his role in the insider trading scheme and his understanding of the magnitude of the trading, this Court held a *Fatico* hearing. In preparation for the hearing, Post attended several meetings with the Government. During each of those meetings, Post's attitude was exemplary. Post was obviously giving his full effort to preparing his testimony, and he gave thoughtful, precise, and truthful answers to all of the questions asked.

During that hearing, the Government called one witness—Post. Post testified for several hours' time, during which he explained, in great detail, the insider trading scheme, the means and methods used by the two men, and the profits earned. He also explained the nuances of the communications between himself and Zwerko. This testimony was extraordinarily valuable because it went to the heart of the issues in dispute at sentencing, including by demonstrating to the Court Zwerko's awareness of the scope and magnitude of the insider trading scheme. It was also valuable to the Government because the other types of evidence that could have proven Zwerko's knowledge, such as the contemporaneous emails and text messages exchanged by him and Post, had been deleted or destroyed by them during the course of their criminal scheme.

During his testimony, like during his proffer sessions, Post was truthful and accurate. He neither minimized nor overstated the criminal conduct of himself and Zwerko. He readily admitted his crimes, and took ownership of times in the past that he had lied, such as to the FBI agents on the morning of their initial approach. He ably withstood a lengthy cross-examination, and answered questions from defense counsel and the Court with the same straightforward demeanor as those posed by the Government on direct examination. Zwerko also testified at the hearing. The difference between Zwerko's testimony and Post's during the hearing was striking. Where Post took responsibility for his crimes and made amends by assisting the Government, Zwerko minimized, defended, and attempted to explain away his criminal conduct. Post's credibility is even more apparent, when viewed in stark contrast to Zwerko's.

Once Post was approached by the FBI and he retained counsel, his conduct makes clear that he was fully on board with admitting his criminal conduct, confessing to serious crimes with which he was about to be charged, and cooperating fully with the Government. Once he chose this path, he acted without hesitation and with unscathed credibility. It was Post's swift decision to cooperate fully that allowed the Government to rely on him to charge Zwerko, and to continue relying on him throughout the case and through Zwerko's sentencing. It is especially important for the Government in cases like this one, involving crimes of deceit and fraud, to choose witnesses who are reliable and above reproach during the cooperation process. Post is such a witness, and the Government submits that was readily apparent during his testimony before this Court.

**Conclusion**

As described above, the Government has determined that David Post has provided substantial and valuable assistance in the investigation and prosecution of Zachary Zwerko for his role in this insider trading scheme. Because of Post's cooperation, the Government was able to swiftly charge and prosecute Zwerko, as well as to seek a sentence that was warranted by exposing the full extent of Zwerko's conduct to the Court. The Government thereby expects to respectfully request at sentencing that the Court sentence Post in light of the relevant facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/s/_____
Jessica A. Masella
Edward Y. Kim
Assistant United States Attorneys
(212) 637-2288/2401

cc: Craig Carpenito, Esq.
Counsel for David Post

Zondra Jackson
United States Probation Officer

(By electronic mail)